May it please the Court, my name is Monet A. Reuerten-Palmer and I'm appearing on behalf of the petitioner-appellant in this case, David Scott Franks. Before I get started with my argument, I'd like to make two quick points that I hope the Court will keep in mind as I proceed today. If I could ask you just to speak right into that microphone to keep your voice up, we'd be much appreciative. Thank you. Can you hear me better now? I can. Thanks much. Okay, perfect. I would just like to make two quick points that I hope you'll keep in mind as I proceed today. It seems we have our name plates are at the wrong place in our book. Anyone confused, this is Judge Pryor, and this is Judge Newsom, and I'm Judge Marcus. Welcome to all of you. What happened to Judge Pryor's hair? The problem is Judge Newsom just went to the wrong direction. So, as I was saying, I'd just like to make two quick points that I hope that you'll keep in mind throughout my argument today. The first is that the District Court was right in this case. No reasonable attorney could have hoped to prevail at the guilt phase of Mr. Franks' trial. The state's evidence against Mr. Franks was staggering, and even his own counsel called the case unwinnable. And yet, trial counsel spent three and a half years developing an outlandish alternative theory of the crime involving an additional group of perpetrators from the so-called Dixie Mafia. Everything they did in support of this theory came at the expense of developing . . . That was your client's theory, right? Yes. Well . . . I mean, it's not like it was an invention of the lawyers. No, it was not an invention of the lawyers, but the . . . And the theory had some basis, right? I mean, it's not cooked up out of whole cloth either. The theory had very, very, very little basis. Well, I mean, so I guess I'm, you know, the Dixie Mafia, the contrast between the way the murders went down, the reference to they . . . so it's not nothing. I mean, it wasn't . . . it doesn't strike me as completely crazy. Sure. The reference to they . . . in the 911 calls, Mrs. Wilson does say, they're hurting my kids, and she's immediately asked by the 911 operator, who's hurting your kids? David Franks. David who? Franks. Please hurry. When she calls back, she has a very similar phone call. Who did this to you? Did your husband? No ma'am. David Franks. But the collective they . . . Sure. That was something a defense lawyer could have latched onto in what was a horrific crime. Sure. He could have latched onto it, or he could have looked at the six other times that Mrs. Wilson identified David Franks by name and by phone. Right. But what about the other piece of evidence, which was that there was a witness who saw four men drive into the parking lot of Franks Pawn Shop that night, get out of the car, push three men through the door of the shop on the morning of the crimes when the two victims were shot and killed? Mrs. Carlisle came forward a year after the crimes in this case to provide that account of what had happened that day. Her testimony as the State vividly brought out at trial was a little bit questionable. She had incredibly minute details of everything that the four men were wearing when they got out of the car, despite saying she was driving by at 30 miles an hour. And most importantly, that testimony actually conflicted with the testimony that Mr. Franks presented. In which way? He said that they entered the pawn shop through the rear of the pawn shop. There was no pushing into the pawn shop by Mr. Franks' account that his trial lawyers put up at trial. Did he confirm that there were four men who came in, the Dixie Mafia guys came in that night? In substance, that was his account. He did give different statements of how many other men were involved, but ultimately what was presented was, yes, there were four men at the pawn shop scene and then two men in Gainesville in the Hall County scene. What about the phone call that was placed from Franks' pawn shop at the purported time of the offenses in Hall County, which was two hours away from the pawn shop? Yes, so it is beyond dispute that Mr. Franks did not make that phone call. Debbie Wilson called Ann Martin, the wife of the other Haralson County victim, David Martin, and said that David Franks was at her house at that moment. So we know that David was not there. At trial, David's girlfriend said that she made that phone call. She came into the pawn shop. She looked around for him. She was afraid because it was dark and she picked up the phone and she hit redial and it dialed the Wilsons' number. And the phone records did show that the Wilsons' phone number had been the number that was at. She testified that a girl answered the phone. And trial counsel, I think, believed her account because they could have called Jessica Wilson to find out if she had been the one to answer the phone or not. She was the only young girl in the house at the time and they didn't. So all of the testimony at trial did not support the Dixie Mafia theory. Once you start looking at the few pieces they had, it seems pretty clear that this theory was not going to win the day. And in fact, Mr. Franks had confessed to a version of the crimes that, as the district court found, hewed closely to the evidence to his counsel in March 1995, only six months after he was arrested. Of course, you have to establish not only that it was unreasonable for them to have defended this way, but that it was, would give it really double deference and so you've got to really establish, given the burdens here, that it was contrary to or an unreasonable application of Strickland for the state court on performance to reach that conclusion. Sure. And I do think it was . . . Which is another way of saying that no reasonable jurist could have said what the state habeas court said. Well, that is what the district court found in this case, that no reasonable attorney could have hoped to prevail at the guilt phase of this case. That's exactly what the district court said. And then they also said, you know, this contradictory finding that his counsel's performance at the guilt phase was reasonable. And those two things cannot be the case at the same time. Yeah, they can. I mean, it might be that you have a fairly hopeless case, couldn't it? And so you pick the lesser of evils in terms of your defense strategy, you pick the least bad one. I hear what you're saying, Judge Pryor, and I think what I'm getting at is that trial counsel didn't spend fifty percent of their time investigating this guilt phase theory just on the off chance that, hey, maybe the Dixie Mafia was really involved. Trial counsel devoted almost the entirety of their investigation to this theory at the expense of developing meaningful mitigation for Mr. Franks for the penalty phase of his trial. So what, though, do you do with the state courts? I guess I take it to be a factual finding that the mitigation investigation was extensive, I think is the word that the state court used. Sure, they did. And not without some basis, right? I mean, you know, met with the family ten times. I think, you know, who was it, Pennington spent a whole day with the mother. So I mean, is that a factual finding to which we have to defer your burden to show clearly erroneous? Yes, that is a state court factual finding. They did find that the mitigation investigation was thorough and reasonable. So I have a few responses to that. First of all, the record does not show that they met with them ten times. The billing records don't support that. Andy Pennington, the investigator in this case, does at one point say he spoke with them, different members of the family, approximately ten times over the three and a half years. We know that there are only a couple of meetings with the family, one of which occurs right before trial. Counsel testifies that their background investigation is really limited to character evidence. They testify to that specifically multiple times in Motion for New Trial and State Habeas. And in fact, the questionnaires that the courts repeatedly discuss to, you know, prove that trial counsel had done so much in their investigation and thoroughly investigated Mr. Franks' entire background are actually completely limited to character evidence. They say, how long have you known David, describe his general character, have you ever seen him be violent toward anyone or anything, and provide specific examples of his behavior that lead you to give that opinion. The postmarks on these questionnaires are the end of December 1997 or a week and a half before trial commenced. So where then does the state court determination that they spent time going, that the family members provided information on background growing up childhood? Sure. So that is my second point, which is that trial counsel completely ignored many, many, many red flags that popped up in this case that would have led them to discover the medication evidence that State Habeas Counsel found regarding Mr. Franks' substance abuse disorder and brain damage. Well, didn't they know? I mean, they knew that he had a substance abuse problem and chose not to use it beyond what they did. What they knew was that he was on drugs at the time of the crime. And so to address that point briefly, what they presented to the jury regarding his drug use was, it was aggravating. It was, Mr. Franks took some meth. He committed this terrible crime. But the real picture of Mr. Franks' substance abuse disorder is actually much more mitigating, and it's inextricably linked with his brain damage and the traumatic background that he had. Is it true that he had some substantial criminal history before he ever became a substance abuser? No, sir. He had a bit of an odd conspiracy to commit robbery charge from when he was 18 years old. My understanding, the record evidence is really limited on it, but it seems that he was maybe friends with the policeman. He had asked a policeman to sort of not be around while he robbed, I think, a shell station that he worked at. And then in the period immediately preceding the crimes, he has a theft by receiving conviction which is pretty common for a pawn shop owner, which David was. And as I hope I laid out well in the brief, I think that that was kind of a part of David's downward spiral in the period leading up to the crimes in this case. So I want to go back to a couple of the other red flags that they missed. Counsel said that they did obtain Mr. Franks' school records, and even though the record is a little bit unclear as to whether they did that, they reported that the records contained nothing remarkable. The records showed that Mr. Franks failed three grades and dropped out of school by the sixth grade, which is certainly a red flag as the Supreme Court has repeatedly found in Rompilla and Porter, and this court has found in many cases as well. They did not request medical records, and so they did not learn that Mr. Franks had a series of head injuries, one when he was four years old, and then he was thrown from a vehicle when he was 18 years old and experienced seizures in the hospital following that accident. Can I take them one at a time? The school records, I mean, I actually sort of agree with you that this is sort of a stunning failure in elementary school, but given the double deference that Judge Marcus was referring to, don't we not only have to conclude that every reasonable lawyer would have dug deeper, but every reasonable jurist would conclude that every reasonable lawyer would have dug deeper, and that seems like an awfully steep hill to climb. I mean, you and I can agree that, boy, that seems weird, failed more grades than he completed or something, but, you know, is it really true that every reasonable judge would conclude that every reasonable lawyer would dig deeper at that point? I think so. I mean, failing three grades and dropping out of school in the sixth grade is certainly a red flag, and the Supreme Court has said that repeatedly in its cases regarding ineffective assistance of counsel. Has said what? Just so I'm clear, has said what repeatedly? School records with poor educational attainment are a red flag, and Ron Pilla, Mr. Ron Pilla told his counsel that he had... They knew he had dropped out of school, right? Yes. And, in fact, tried to put a positive spin on it, right? They said he did it because he was trying to aid his mother, right? Okay, yes, that's true. They did say, or Doris Franks, Mr. Franks' mother, did testify that he had done that in order to help support her. But certainly failing second, third grade, and sixth grade once before then just dropping out altogether is a red flag, and it is my position that any reasonable jurist would conclude that any reasonable lawyer would fall up on those records. Let's assume, for the purposes of my question, that you can penetrate both levels of deference on performance. Help me with prejudice. This was an overwhelming case, it seemed to me, in so many ways, and such a powerful showing. What reason is there for me to believe that the determination by the state habeas court on prejudice was contrary to or an unreasonable application of clearly established Supreme Court law? So, as this court just found in Jefferson last week, the new mitigation evidence that was presented in state habeas proceedings would have profoundly altered what was presented about Mr. Franks' sentencing. What the jury heard in this case was that Mr. Franks was a good guy. He was kind and gentle to everyone. And nonviolent. And nonviolent. And yet, the jury had convicted him of what is unarguably an awful crime. Counsel's sentencing presentation . . . He inarguably committed. That he was convicted of committing, yes, sir. Well, I mean, you now admit that he committed it. That's not the question, right? I mean, the innocence theory was the theory he told his lawyers and that you say they unreasonably pursued. The whole point is that he did commit it, right? I think it was unreasonable. Yes, I agree with you that it was unreasonable for his counsel to . . . To pursue that because he committed it. Because he, in fact, committed it, right? I don't feel like it would be an appropriate thing for . . . My client has never given me permission to concede his guilt, and so I cannot do that. I don't think that's the right thing for me to do for my client. But I stand by my statement that the evidence was overwhelming against him and that trial counsel was unreasonable for . . . See, now, you don't have to convince me that if you could have presented a powerful case of organic brain damage with frontal lobe injury, which is what we had in Jefferson where a car ran over the two-year-old skull at two, and we had a bevy of psychiatrists and psychologists who testified that it was directly and immediately involved in explaining the crime itself, that you might have a very different story here. But when I look closely at what Grant and Anton said, I didn't see anything remotely like the record that we had in Jefferson. What am I missing there? Well, Dr. Grant testified that Mr. Franks had a number of insults to his brain while he was growing up in the developmental phase, so, you know, zero to . . . or prenatally to 21. He had a couple of very serious illnesses. When he was about one, he experienced an extremely high fever that was so damaging that he permanently lost vision in one eye. When he was four or five years old, he fell off the porch and hit his head on a sort of a large rock or a boulder or something along those lines and broke his head open. But none of them say that he sustained organic brain damage. The most they could say is that it was possible that he had shown some deficits in executive functioning, planning, and judgment, as opposed to what we had in Ferrell or what we had in Jefferson, let's say. It was a very different posture of the medical evidence that was presented. Okay. I read them as quite similar. In Porter, what Dr. Grant testifies is that he has cognitive impairments, and I believe that the term used by experts is brain injury, which I take to mean brain damage. And in Porter, I believe that the term that the Supreme Court used was actually brain abnormality. So I am . . . I think that I've established or that state habeas evidence established that Mr. Franks does have a brain abnormality that is the result of some combination of these insults that he experienced prior to. So correct me if I've got the record wrong, but didn't the IQ tests show what, 90 to 95? Grant says not even remotely, not even borderline mentally retarded, right? Sure. And he says, I think he said the deficits were not glaring, his word. And then he also says, most importantly perhaps, that the deficits didn't affect his ability to distinguish between right and wrong. So I want to try to address all of those points. So it's my read on Dr. Grant's testimony that he said that it's not glaring in reference to like an intellectual disability, that that statement immediately follows a discussion of intellectual disability. And certainly I have not posited that Mr. Franks had an intellectual disability, but brain damage are two very, very different things. And even if Mr. Franks knew the difference between right and wrong and was clinically and legally sane at the time of the offense and at the time of trial, that does not mean that he was able to conform his behavior and conduct to the law. So somewhere between intellectual disability of the sort that we might typically categorize as mentally retarded, we understand that's sort of a special category, and an inability to distinguish between right and wrong, there is this brain abnormality that sort of slots in somewhere else, one's inability to conform one's conduct? Yes. And I mean, the Supreme Court and this court have repeatedly found brain damage, frontal lobe damage, deficits in executive functioning, memory issues, all of these to be mitigating in Rompilla, in Wiggins, in Porter, in Jefferson, in Farrell. And I know, Judge Marcus, you take the position that it's a little bit different. No, I don't have a position. I'm just saying that I remember the record vividly in Farrell and Jefferson, and it struck me that the nature of the mental health experts' testimony was on a very different plane than what we had here. Perhaps I'm wrong about that, but that is really what I'm asking you to address. Okay. My read on it is that Mr. Franks' cognitive impairments are the same as the cognitive impairments that this court said were mitigating in Jefferson and in Farrell. It's executive functioning issues, frontal lobe impairment, inability to plan, memory problems, and all of these things that are associated with frontal lobe. Tell me why a state habeas judge could not say, even accepting that there was some abnormality, some diminution in executive functioning, et cetera, that when you looked at the nature of the crimes here, one, they were so extraordinarily horrific, two, the defendant was able to elude the police for nine days, three, that he took a number of steps that the state court concluded were designed and intended to elude and cast doubt on him being the killer in the case, including attempting to kill the children, murdering the wife, shooting Wilson and the other cohort at the pawn shop, and then proceeding to escape, changing cars on multiple occasions, et cetera. It suggests that the state court could reasonably find, does it not, that he was quite capable of functioning, executing decision making at a surprisingly high order, and beyond all of that, he managed to run two businesses for extended periods of time. Couldn't a state judge look at all of that and say reasonably that I don't think the result would have been different? I will probably run over in my time. That's all right. You're on my time. Okay. So as to the businesses, I want to address that first. I think that Mr. Franks' record of business and ownership is actually quite consistent with brain damage. He did a pretty terrible job of running these two businesses and ran them into the ground in a pretty short period of time after his father-in-law pulled out of the businesses. As for the rest of it, I think that this picture of Mr. Franks that would have emerged if counsel had developed this compelling mitigation evidence of brain damage and substance abuse disorder,  Not only that, that no competent attorney would have chosen not to do it and no state court could reasonably conclude otherwise. Yes. I think no competent attorney knowing that his client had failed. That really goes to the heart of Judge Marcus' question. Sure. I hope that I am . . . Not just, you know, I disagree, I think it should have been done this way. Right. Right. I hope that I am answering properly and that I'm understanding your question accurately. No, I think you've got it. Okay. I do think no reasonable attorney would conduct themselves the way that Mr. Franks' counsel conducted themselves in this case. They didn't follow many, many red flags showing that Mr. Franks had these significant impairments and made really no effort whatsoever to investigate any mitigating evidence. You're right, this crime was aggravated. All death penalty cases are aggravated. And it was counsel's . . . Some are worse than others. Some are worse than others, certainly. This one's . . . this is on the bad end. You know, this court has previously found in another triple murder case . . . Involving children having their throats slashed. Well, in Cooper, there was a triple murder and there was a child present at the scene of the crime. The facts were very similar and because of Mr. Cooper's trauma, poor educational attainment and cognitive impairments, this court found that his trial counsel had performed ineffectively by failing to raise any of that in the penalty phase of his trial. Thank you much and you have reserved your full eight minutes for rebuttal. Thank you. May it please the Court. My name is Chanel Singh and I'm here on behalf of the Warden asking this court to affirm the District Court's denial of relief. And relief in this case, Your Honors, is precluded by the AEDPA. I want to address prejudice first since that was the last thing that the court touched on with Mr. Frank's counsel. And as for prejudice, Your Honors, the State Habeas Court found no prejudice and it reasoned that there would be no reasonable probability of a sentence other than death in this case because the evidence offered by Mr. Frank's in mitigation was either . . . the additional evidence, excuse me, offered in mitigation was either cumulative, in part, or weak. And it was weak because it was refuted and undermined by the record itself. First, Dr. Grant, as Judge Newsom pointed out, said that there was nothing glaring in the opinion of his evaluation. He also said that there was nothing in his report that would make attorneys' hearts palpitate. So what about, though, your adversary's response to me that says, yeah, yeah, yeah, you're putting that to the side. Then you're talking about sort of moral sort of culpability. Put that to the side. Let's talk about his ability to conform his conduct to societal standards. And she says, that's what I'm talking about. So the heart palpitation non-glaring deficits, she says, go to either bucket one or bucket three but not bucket two. What about that? So as to his not being able to conform his conduct to the law, I would go back to what trial counsel testified to in, say, habeas and a motion for new trial. And he testified to this type of information not being mitigating and that a Hall County jury would find this type of evidence to be aggravating because part of that information that Dr. Grant relied on had to do with drug usage and that being an alleged risk factor for his cognitive deficit. And Mr. Homans explained in the motion for new trial in the state habeas hearing that somebody on drugs committing this crime would not have been mitigating. Right. But wouldn't that have amplified and corroborated the defendant's account? The defendant's account, after all, was that A, I didn't shoot these guys at the porn shop. It was this Dixie Mafia who did that. B, I was coerced and went to Mrs. Wilson's home. I didn't stab her either. I didn't kill her. And there came a point where I just sort of blacked out and I don't remember what happened and the two children were very badly assaulted with a knife. But I don't know what happened. I can't really tell you. I kind of like blacked out. I thought their argument was that this mental health stuff plus the drug abuse provides an arguable explanation for what happened at that point. Did I misapprehend that? Your Honor, I believe Mr. Franks now does allege that this provides an arguable explanation for what happened. And I would argue that trial, sorry, Your Honor. And I would argue that trial counsel's position would be that this type of evidence that Mr. Franks' counsel is now arguing would erode their original theory of residual doubt. And it wouldn't amplify what trial, or excuse me, what Mr. Franks is now trying to say. And that's because trial counsel specifically said that they, yes there was drug usage involved, but there was no argument that Mr. Franks committed these crimes while he was on drugs. And Your Honor, even Mr. Robbins testified that the forensics didn't pan out with Mr. Franks being on drugs while committing these crimes. And I think that's what Mr. Franks is now saying, that these crimes were committed in a drug-fueled frenzy that was brought on by his alleged cognitive deficits. And to go back to the state habeas court's reasoning of finding this weak, that's because Dr. Grant specifically said, yes he has difficulty planning, but he can still plan to kill and he can still formulate the requisite intent, excuse me, for malice murder. And as Judge Newsom said, another factor that the state habeas court took into consideration was that Dr. Franks testified that someone being under the influence of drugs was still able to distinguish between right and wrong. And so the jurors would have heard that and the state habeas court took that into consideration in its finding of no prejudice. As to Mr. Franks' alleged brain damage, the state habeas court also found that evidence weak because on cross-examination, Dr. Grant was confronted with Mr. Franks' medical records. And yes, he had a car accident at age 18, but the primary injury was his back injury. And the doctors had Mr. Franks undergo treatment for which he received an EEG and a CAT scan and both came out normal. Also as to... EEG and CAT scan of the brain. Yes, yes, Your Honor. And both of those results came back normal. And also his mother testified that he didn't lose consciousness at his fall at age four. And the state habeas court also pointed out that Mr. Franks' new revelations of his illnesses were not reconciled with his medical records, which showed that he had a healthy birth. He was eight pounds at birth. His childhood medical records showed that he only had some colds. He had whooping cough at two. There were no fevers, no evidence as such that he reveals now. Also, with respect to Dr. Anton, he testified as a polysubstance abuse expert. And the state habeas court also found that his testimony was not credible in its prejudice analysis because Dr. Anton opined that Mr. Franks had committed these crimes in a drug-fueled frenzy, but that when he comes off the drugs in a sort of cooling down period, he returns to his hospitable and courteous self. But again, the state habeas court found that that couldn't be reconciled with Mr. Franks having held hostage an elderly couple well after the crimes against Mrs. Wilson and her children were committed. And when he held them hostage, he held them there for at least five hours in a garage in August in Alabama in the heat without water. So, Your Honors, with respect to the prejudice analysis, I would argue that that's precluded under the eight DPA of the state habeas court's finding. And then going back to deficient performance, the state habeas court found as fact that Mr. Franks' trial counsel conducted their mitigation investigation alongside their guilt phase investigation. It wasn't something that was put to the side and that the guilt investigation was something conducted in lieu of the mitigation investigation. And that finding is supported by the facts in the record by trial counsel testifying that as soon as they met with Mr. Franks' family, and that was on September 6th, I believe, or excuse me, 1994, which was shortly after Mr. Franks' committal hearing, Mr. Robbins asked their family all about his background. They wanted to know information about his developmental history, his mental health history. And then when Mr. Homans met with the family, and he met with them later because he was appointed to the case later, he asked them as well about Mr. Franks' background, anybody who was influential with him. And something I think is telling is that Mrs. Mashburn, in the motion for new trial hearing, testifies that they never discussed anything about his background. And yet, at that very same hearing, she says that she was amazed that Mr. Homans' knowledge of Mr. Franks' or excuse me, yes, of Mr. Franks' background, that he had a file very thick. He knew about everybody in that file and everything about Mr. Franks' family. So let me ask you this. I confessed earlier to being sort of troubled by the failure to investigate the school records. Yes, Your Honor. I mean, it is a pretty stunning transcript, right, to have failed out of as many grades as you've completed by the sixth grade and then to drop out. What do you say about that? Yes, Your Honor. I think the state habeas court found that that was reconciled with Mrs. Franks, Mr. Franks' mother's testimony where she explained his illnesses having to do with the absences in the, I believe, second and third grade. And then in the sixth grade when he was 14 years old, that's when they separated from Mr. Franks' father and he had to go and start working to support the family, which goes back to Judge Pryor's point, saying that trial counsel in their arguments to the jury as part of their theory of residual doubt explained to the jury that this was a person who was not violent, this was outside of his character, and so it supported their theory of residual doubt that he would have started working as a young child to support his family. So I think, Your Honors, with those two points in mind, the state habeas court's decision with respect to trial . . . Well, how much did they actually do when it came to exploring the record, the school record? Your Honor, trial counsel testified that they reviewed the school records and that there was nothing remarkable. That's all in the record with respect to what they did for the review of the school records. How many times was he left back? I'm sorry? How many times was he left back? Yes, Your Honor. He wasn't promoted in the second grade, in the third grade, and then he dropped out of school in the sixth grade. And, Your Honor, I think it's also telling because the state habeas experts talk about the family environment contributing to his cognitive deficits, and Calvin, who was Mr. Franks' brother, he skipped two grades while he was in elementary school and his sister had also went to college. So I think all of this put together in front of the jurors, this would not have led to a reasonable probability of a sentence other than death, and I think the state habeas court's finding was reasonable. And so if there are no further questions from me . . . So I've got one. What about, we haven't really talked about this much, but what about the seeming misapprehension of law on the mental health expert where they thought, well, we can't get the funds, and if we do hire him, we're going to have to turn over the file. It turns out the Georgia Supreme Court says that's just wrong. Yes, Your Honor, that was the finding of the Georgia Supreme Court. Because this was an ineffective assistance of appellate counsel claim, the state habeas court had to reexamine trial counsel's performance, and as part of that, the record was more developed. And if you see the record with respect to the trial court's limitations on ex parte hearings, that was something that was presented in the state habeas court. And in that hearing that had to do with investigators, and it didn't have to do with mental health experts, trial counsel and the trial court were talking about what can be revealed to the state with respect to what they want for experts. And also, although this particular part of the hearing was ex parte, the trial court had the state come back in after that hearing was done and had trial counsel at the trial court's direction tell the state who their new investigator would be, his background, and the fees that would be provided to this new investigator. So I think the state habeas court found trial counsel's reasoning for not, for thinking that they would put the state on alert about any mental health expert reasonable. Would it be easier, I guess? That sounded, I don't mean to be disrespectful, but that sounded like kind of hard for me to follow. Sorry, sure. Talk, talk, talk. But I mean, I guess would it be easier to say simply that there wouldn't have been prejudice because we've seen what sort of mental health evidence there is in the case, and I'm not really sure it would have moved the needle. That's correct, Your Honor. There wouldn't have been prejudice. And also, just additionally, the state habeas court found. And I take it even if the appellate counsel was ineffective in that regard, you'd still have to penetrate to the trial counsel. And the essential question is, was trial counsel ineffective? Correct, Your Honor. And if the answer to that is no, it wouldn't matter whether the appellate counsel was ineffective in the presentation, would it? It would not matter, Your Honor. What you were originally trying to say. Yes, Your Honor. That's when I went to prejudice first. But additionally, trial counsel testified that they found no basis for a mental health expert before Mr. Franks' revelation mid-trial. Okay. So, Your Honor, in conclusion, I would just argue that the state habeas court's reasoning for both no deficient performance as to trial counsel and no prejudice was reasonable. Therefore, his decision that appellate counsel were not ineffective should be affirmed. Thank you very much. Thank you. I just want to address a few things that Respondent's counsel brought up. She said that Judge Newsom, you discussed the ex parte hearing. Yes, there is an explicit finding in the Supreme Court of Georgia that trial counsel made a mistake of law. I developed that extensively in my briefing. Ms. Things said that she thinks that the state habeas court found that this was reasonable. And I may be wrong. I was flipping through my notes very quickly. But I don't believe there is a finding on this issue in the state habeas court. I believe that the finding of the Supreme Court of Georgia is the last finding in this case on that particular issue. Correct me if I'm wrong. I thought that's a question, though, of ineffective assistance of appellate counsel, right? So, I'm sorry. That was an issue, though, of ineffective assistance of appellate counsel, right? No. The Georgia Supreme Court made actually two distinct findings on a mistake of law, one that pertains to appellate counsel and one that pertains to trial counsel. Appellate counsel's mistake of law was that they failed to present any evidence whatsoever in support of the second prong of their Strickland claim that trial counsel had performed efficiently at the penalty phase of Mr. Franks' trial. The Supreme Court of Georgia made a separate finding that trial counsel had performed efficiently by making this mistake of law regarding mental health expert assistance. So, we have two distinct mistake of law findings. And so then, what, though, in response, I guess, to my suggestion that the more difficult piece for you is that there might not be prejudice with respect to that failure. Even if there was a mistake of law and it's unreasonable to misunderstand the law such that you don't hire your own mental health expert, can we really say that there would have been prejudice? Because, you know, sort of knowing what we know about the mental health records, it may just not be that troubling. So, my position is that there absolutely would have been prejudice. Mr. Franks' evidence showed that he suffers from a substance abuse disorder and that he has brain damage and cognitive impairments that led to what happened during this crime. Respondents' counsel suggested that there was no evidence that Mr. Franks was on drugs at the time of the crime. I do want to address that because that seems to have been a given at the trial. And Mr. Wilson was found with methamphetamine in his system. And it was Mr. Franks' testimony that they had all been consuming drugs together during the crime. So, I don't think it's really disputable that Mr. Franks was on drugs. And everybody in this case has taken the position for the last 25 years or however long it's been that Mr. Franks was on drugs at the time of the crime. I want to address the issue. Of course, the problem that you have there is even if that's true at the time of the crime, the sequelae lasts for a pretty long period of time. And you've got days, nine days before he's actually apprehended by the police. Sure. And along the way, he has the presence of mind to break into a home and basically lock up in a hot barn an elderly couple until the daughter comes and gives him the keys to the car, which he uses to get away. The suggestion is not made that he was on drugs the whole time, is it? No, definitely not. And I certainly don't dispute that those were. So, we don't have any evidence about half-life, but you've got a pretty long period of time here. Right, you said nine days. From the time of the events the night before the homicide to the time of apprehension is nine full days. And that tends to undercut the argument somewhat, doesn't it? That Mr. Franks committed these crimes in a drug-fueled frenzy that exacerbated his existing cognitive impairments. I think that there is a significant qualitative difference between locking some people in a shed for a period of time and the crimes at issue in this case. I do still think, and it is my position, that one juror is all we need. And I do think that one juror would have found the evidence of Mr. Franks' substance abuse disorder that resulted from trauma and genetics and his cognitive impairments to be mitigating. Certainly, there was aggravating evidence presented by the state in this case, but this court and Supreme Court have found that psychiatric mitigating evidence undermines aggravating factors in some cases, and perhaps that would have happened here also. As to the point that the evidence that was presented at state habeas would have been cumulative or was cumulative, I do want to address that. There was no evidence presented of cognitive impairments at the trial. There was no evidence presented of a substance abuse disorder at the trial. There was an extremely limited amount of evidence from David's brother. He said, and I quote, our childhood was not exactly a rose one and testified that their father was abusive and had once shot at David and David's mother. Well, that's what the brother said collaterally later, too. Yes. He said that the father shot a long arm between a weapon between the mother and the defendant when they were sitting on the porch or something like that, right? That did come out. Yes. It just didn't come out from the mother. It came out from the brother. Right. Exactly. So Calvin, David's brother, does give this testimony about their father, Charles. But there's nothing new about that. There's nothing new about that particular incident. So why isn't this largely cumulative in nature? Because that was really just one incident of abuse that he described. Right. But the mother described two instances. Once the father jumped on the defendant and once the father kicked the defendant. That was the totality of the physical abuse, right? Other than the shooting? What was in her testimony. Yeah, the shooting. Within the totality of what you presented collaterally. Yeah, in David's testimony. That's what I meant. I'm sorry. Yes, she does testify to a significant amount of emotional abuse. And what David's brother referred to in his testimony as domestic terrorism on the part of David's father. None of that was presented. And as I said, none of the substance abuse evidence was presented. None of the brain damage evidence was presented. There's significant amount of evidence that did not come out at trial. Saying their childhood is not exactly a rose one and that his father shot at them on the couch once came nowhere close to the evidence that came about in state habeas. This court has repeatedly found that even when new mitigating evidence echoes other mitigating evidence or duplicates it to some extent, that providing specifics or particularized characteristics or particularities in effective assistance can still be found in those cases. Let me ask you just one final question. What significance, if any, are we to attach to the fact that the trial lawyer who was experienced said, my own experience is that using sort of these drugged up defense is not likely to be very successful with this jury in this community. My own judgment is in the face of horrific murders and attacks, that's not the way to go. So strategically, my own view, the lawyer says, was I was better off with he didn't do it and even if you found that he did do it, you've got to have some abiding doubt about that. And so residual doubt struck me as tactically a wiser way to proceed. Why could not competent counsel reach for that rather than the alternative? Sure. I'm glad to address the issues with what counsel said about the jury. So as an initial matter, neither Mr. Robbins nor Mr. Holmans had experience in the penalty phase of a capital trial. So I would like to note that at the outset. They may have had some experience with criminal cases, but neither one of them had ever defended the penalty phase of a capital trial, which the Supreme Court specifically note in Porter and finding Porter's counsel ineffective. I don't think they were in a position to know what a capital jury in Hall County would have found mitigating because they had never been in front of a capital jury in Hall County. And I think that counsel's testimony on this point is a little bit problematic because counsel, in fact, testified. The jury, the judge credited that, the trial, the state habeas judge credited that testimony. What are we to do with that? We certainly have to defer to some extent to what the state habeas judge found. Counsel testified that this jury, that the jurors in this veneer had said that they, quote, didn't want to hear a sob story. That didn't happen. As I addressed in my briefing, there is no area in the voir dire in this case where any juror said, I do not want to hear a sob story. In fact, the only juror to address that specific point said that they would be willing to consider a sob story. So counsel's credibility is very, very much in question on this issue. I thought Robbins had been involved in one death penalty trial. Well, had taken one death penalty case to trial and had been involved in several more. Is that not right? No. Mr. Homans defended somebody who was acquitted. I'm not talking about Homans. I'm talking about Robbins. Homans worked for the DA's office, right? But he had experience defending a death case that went through and the client was acquitted. And he testified that he had delegated the responsibility for conducting the mitigation investigation to his co-counsel on that case. So we know that he didn't prepare for the sentencing proceeding. Mr. Robbins had never tried a capital case in front of a jury. He had been involved. And then I think he was conflicted out of the case that he had been involved in at some point long before it went to trial. And I believe he was involved in another case that played out. Thank you very much, counsel. Thank you.